**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**
**MILWAUKEE DIVISION**

| | | |
|---|---|---|
| MOHAMED SALAH MOHAMED AHMED EMAD, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 19-cv-00598 |
| RICARDO WONG, Field Office Director, Chicago, U.S. Immigration and Customs Enforcement ("ICE"), PAUL D'AGOSTINO, MICHAEL McPHERSON, DODGE COUNTY, DODGE COUNTY SHERIFF DALE SCHMIDT, JAIL ADMINISTRATOR ANTHONY BRUGGER, WELLPATH, and HEALTH ADMINISTRATOR TAMMY WOLLIN, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFF'S MOTION AND MEMORANDUM IN SUPPORT OF A**
<u>**PRELIMINARY INJUNCTION**</u>

Mr. Mohamed Salah Mohamed Ahmed Emad is a stateless Palestinian Muslim who has

lived in the United States for 25 years. He is a devout Muslim and an asset to his community.

For no legitimate reason, the Federal Bureau of Investigations ("FBI"), relying on "information"

it new to be false and/or unreliable from a paid confidential informant, labeled Mr. Emad a

terrorist without affording Mr. Emad any due process protections, including notice and an

opportunity to contest the false label, and shared that false label with Immigration and Customs

Enforcement ("ICE"). Based on this false information, ICE arrested Mr. Emad and placed him in

detention at Dodge County Detention Facility ("Dodge County Jail") on March 12, 2018. Mr.

Emad was subsequently denied bond because of this false terrorist label, and now, over a year later and more than 180 days after Mr. Emad was ordered removed, ICE continues to assert this false label as a prextual guise for their discriminatory motivations to keep Mr. Emad detained. Because Mr. Emad is considered stateless and therefore unremovable, he faces the possibility of indefinite detention because of the administration's discriminatory animus toward Muslims and Palestinians.

While at Dodge County Jail, Mr. Emad has received inadequate care for his serious mental health needs. He suffers from anxiety and Jail staff are denying him access to necessary medication and mental health counseling. Additionally, Mr. Emad has been denied the ability to freely exercise his religion. He is being denied access to a space for Jumu'ah (Friday Prayer)—a sacred ritual that requires communal prayer in a clean space. He is also forced to pray every day in his cell, just inches from his toilet. Mr. Emad has already faced serious spiritual, mental, and emotional injury since being arrested by ICE, and he will continue to face a grave risk of serious injury is he remains confined under these conditions.

For these reasons, and pursuant to Federal Rule of Civil Procedure 65, Mr. Emad seeks a preliminary injunction ordering the Defendants in their official capacities to provide him with adequate mental health services, allow him to freely exercise his religion, and remove the false terrorist label. Specifically, Mr. Emad seeks an order against Defendants Wellpath, Health Administrator Tammy Wollin, Dodge County Sheriff Dale Schmidt, Jail Administrator Anthony Brugger, and ICE Field Director Ricardo Wong requiring that they:

      1)    Require relevant staff and contractors to provide Mr. Emad with adequate medical care, specifically mental health care, including, but not limited to required medication, counseling services, and other medically necessary interventions.

Mr. Emad seeks an order against Defendants Dodge County Sheriff Schmidt, Jail Administrator Brugger, and ICE Field Director Wong requiring that they:

        1)      Require relevant staff and contractors to provide Mr. Emad with the opportunity to practice his religion, including, but not limited to permitting him to conduct Jumu'ah and to conduct daily prayers in an acceptable, clean environment.

And finally, Mr. Emad seeks an order against Defendants ICE Field Director Wong, ICE Section Chief Paul D'Agostino, and FBI Section Chief Michael McPherson requiring that they remove the terrorist label and clear Mr. Emad of any indication that he is a danger to national security.

Preliminary injunctions are granted in extraordinary situations where there is a clear showing of need. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Cooper v. Salazar*, 196 F.3d 809 (7th Cir. 1999). The need here could not be more obvious or more immediate. Mr. Emad's situation satisfies each requirement for a preliminary injunction: (1) he will succeed on the merits because the Defendants have so clearly violated (i) his rights under the Fourteenth and Fifth Amendments by failing to provide him with adequate medical care, (ii) his rights under the First Amendment, the Religious Land Use and Institutionalized Persons Act (RLUIPA), and the Religious Freedom Restoration Act (RFRA) by denying him the ability to freely exercise his religion, (iii) his rights under the Fifth Amendment by damaging his reputation without affording him due process, and (iv) his rights under the Fifth and Fourteenth Amendments by intentionally discriminating against him on the basis of his religion and national origin; (2) in the absence of intervention by this Court, Mr. Emad will suffer irreparable harm—namely because ongoing First Amendment violations always constitute irreparable harm, and because there is a substantial likelihood that his mental health will decompensate and that he will continue to be labeled a

terrorist, causing him to remain detained indefinitely; (3) there is no adequate remedy at law—only an injunction will ensure that the Defendants allow him to freely exercise his religion, provide appropriate mental health care, and remove the false terrorist label; and (4) ensuring that the Defendants do not violate Mr. Emad's rights as protected by the Constitution and federal statutes will further the public interest and will not harm the Defendants in any way. *See AM Gen. Corp. v. DaimlerChrysler Corp*., 311 F.3d 796, 803-04 (7th Cir. 2002). Thus, this Court must act in order to ensure that Mr. Emad's rights are not continually violated.

I.  **Mr. Emad's claims that Defendants violated his rights under the Constitution, RLUIPA, and RFRA will likely succeed on the merits.**

In order to demonstrate a substantial likelihood of success on the merits, a plaintiff must demonstrate "a plausible claim on the merits." *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009). Courts should not "improperly equat[e] 'likelihood of success' with 'success.'" *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 782 (7th Cir. 2011) (quoting *University of Texas v. Camenisch,* 451 U.S. 390, 394 (1981)). "[T]he threshold for establishing likelihood of success is low." *Id*. A plaintiff need "only to present a claim plausible enough that (if the other preliminary injunction factors cut in their favor) the entry of a preliminary injunction would be an appropriate step." *Id.* at 783. To determine whether a plaintiff's legal argument has a likelihood of succeeding, courts use whatever existing test would be employed to decide the merits of the case. *See S./Sw. Ass'n of Realtors v. Evergreen Park, IL*, 109 F.Supp.2d 926, 927 (N.D. Ill. 2000). In this case, Mr. Emad has a high chance of success on the merits of all his claims, but below will focus on the claims particularly relevant to the emergency relief he seeks.

A.  **Mr. Emad will prevail on his claim that Defendants violated his rights under the Due Process Clause of the Fourteenth and Fifth Amendments by failing to provide him with adequate mental health care.**

4

Mr. Emad is a civil immigration detainee and his constitutional claim here regarding access to mental health care is evaluated in the same manner as that of a pretrial detainee—under the due process clause of the Fourteenth and Fifth Amendments instead of the Eighth Amendment. *See Belbachir v. County of McHenry*, 726 F.3d 975, 979 (7th Cir. 2013); *Edwards v. Johnson*, 209 F.3d 772, 778 (5th Cir. 2000); *see also Unknown Parties v. Johnson*, No. CV-15-00250-TUC-DCB, 2016 WL 8188563, at *4 (D. Ariz. Nov. 18, 2016) ("because Plaintiffs are civil [immigration] detainees and not prisoners, the Court applies the Fifth Amendment, mirrored by the Fourteenth Amendment, Due Process Clause" to their conditions claims, including denial of medical care claim, against federal defendants). The Seventh Circuit has recognized that, because the Eighth Amendment cannot apply to pretrial detainees, the Fourteenth Amendment's "objectively unreasonable" standard applies broadly in the pre-trial detention context, including access to medical care claims. *Miranda v. County of Lake*, 900 F. 3d 335, 351 (7th Cir. 2018) (*citing Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2472-73 (2015)). Therefore, to succeed on a failure to provide adequate mental health care claim, Mr. Emad must show that Jail medical staff (1) intentionally failed to provide him with adequate mental health care by failing to give him his medication and counseling services, and (2) they were objectively unreasonable in doing so. *See McCann v. Ogle County, Ill.*, 909 F.3d 881, 886 (7th Cir. 2018). And to find the Defendants liable for the medical staff's misconduct, Mr. Emad must show that they know about the misconduct and "facilitate it, approve it, condone it, or turn a blind eye." *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009); *Rasho v. Elyea*, 856 F.3d 469, 478 (7th Cir. 2017).

Since arriving at the Jail over a year ago, Mr. Emad has made numerous verbal as well as written requests through the grievance process to Jail staff for his medication. Despite his repeated requests, medical staff refuse to give him Lorazepam, which he requires to treat his

anxiety and was taking every day for around six years prior to him being detained. *See* Ex. 1, Davis Decl. Lorazepam is necessary to treat his serious mental illness, and without it, his mental health has and will continue to deteriorate—he is currently suffering from anxiety attacks, high blood pressure, night terrors, and difficulty breathing. Therefore, the medical staff's failure to provide him with his medication is objectively unreasonable. *See, e.g.*, *Carpenter v. Sullivan*, 695 Fed. App'x. 147, 150 (7th Cir. 2017) (using the stricter deliberate indifference standard, holding that a detainee's allegations that a detention center nurse refused to dispense pain medication given to him by an endodontist after a root canal and that no doctor at the detention center assessed the endodontist's treatment plan before the nurse refused to give him the medication were sufficient to allege a Fourteenth Amendment due process claim); *Shoemaker v. Rogers*, No. 3:18-CV-80 RLM-MGG, 2019 WL 1275088, at *2-3 (N.D. Ind. Mar. 19, 2019) (finding that plaintiff sufficiently stated claim against defendants for being deliberately indifferent to his severe mental impairments (bipolar disorder and depression) by not giving him the antipsychotic medications that a doctor had prescribed him); *Awalt v. Marketti*, 74 F. Supp. 3d 909, 931 (N.D. Ill. 2014) (holding that a reasonable jury could find that nurse's decision to refuse to give detainee a particular anti-seizure medication constituted deliberate indifference); R*omanelli v. Suliene*, No. 3:07-cv-00019, 2008 WL 4587110, at *7-11 (E.D. Wis. Jan. 10, 2008) (using the stricter deliberate indifference standard, denying summary judgment on pretrial detainee's claim that defendants violated his right to adequate medical care by refusing to treat his Crohon's disease where the defendants knew about his serious medical need and provided no treatment to him).

Additionally, for many years prior to being detained, Mr. Emad was regularly seeing a psychiatrist, Dr. Denise Davis, to treat his anxiety. *See* Ex. 1, Davis Decl. The medical staff's refusal to allow Mr. Emad to see a mental health professional, despite his request to speak to a

mental health counselor to treat his anxiety, also is objectively unreasonable. *See, e.g.*, *Love v. Clarke*, No. 11-CV-882, 2011 WL 6755834, at *3 (E.D. Wis. Dec. 23, 2011) (refusing to dismiss pretrial detainee's inadequate medical care claim because "[a] diagnosed mental illness that needs to be treated is a serious medical need" and "[k]nowledge of the condition and placing [his] health at risk by not doing anything to get him the treatment deemed necessary is sufficient to allege deliberate indifference"); *Williams v. Nelson*, No. 04-C-0774-C, 2004 WL 2830666, at *10 (W.D. Wis. Dec. 9, 2004) (finding that pretrial detainee's allegations that decisions regarding his treatment as an involuntarily committed sex offender were not being made by persons with appropriate training in mental illness and that he was receiving inadequate treatment for an anxiety disorder, mood disorder, and depression were sufficient to state a claim for failure to provide minimally adequate treatment in violation of the Fourteenth Amendment).

Further, the Wellpath Defendants and the Dodge County Defendants all knew about Mr. Emad's requests for his medication and services to treat his anxiety, and yet they failed to make the medical staff provide him with adequate mental health care, thereby facilitating, approving, and condoning the medical staff's misconduct. Additionally, Defendant Wong allows ICE detainees to be housed in substandard conditions and fails to take action to ensure that ICE detainees are provided with adequate mental health care. Accordingly, Mr. Emad will prevail on his claim that Defendants failed to provide him with adequate mental health care.

### B. Mr. Emad will prevail on his claim that Defendants violated RLUIPA, RFRA, and the Free Exercise Clause of the First Amendment.

RFRA prohibits the federal government from placing "substantia burdens on 'a person's exercise of religion'" unless the burden "is the 'least restrictive means of furthering a compelling governmental interest.'" *Korte v. Sebelius*, 735 F.3d 654, 659 (7th Cor. 2013) (quoting 42 U.S.C. § 2000bb-1)). RLUPIA applies to state or local governments and, like RFRA, it prohibits the

7

government from imposing a "'substantial burden on the religious exercise of a person residing in or confined to an institution' unless the burden is the 'least restrictive means' of serving a 'compelling governmental interest.'" *Kaufman v. Pugh*, 733 F.3d 692, 696 (7th Cir. 2013) (quoting 42 U.S.C. § 2000cc-1)). The Free Exercise Clause prohibits the state from imposing a substantial burden on religious exercise unless the burden is "reasonably related to legitimate penological interests." *Id.* (quoting *O'Lone v. Shabazz*, 482 U.S. 342, 349 (1987)). A person's religious exercise is substantially burdened when he is required to "engage in conduct that seriously violates [his] religious beliefs." *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2775 (2014)); *see also West v. Grams*, 607 Fed. App'x 561, 567 (7th Cir. 2015) ("The correct standard . . . is whether a particular restriction "seriously" violates or contradicts an inmate's religious beliefs.").

There is no doubt that Mr. Emad's ability to exercise his religion is substantially burdened by the Jail's refusal to allow him to conduct Jumu'ah. Jumu'ah is a religious obligation for Muslims and requires communal prayer with at least one other Muslim in a clean room at a designated time every Friday. Instead of doing Jumu'ah, Mr. Emad is forced to do a normal Friday prayer alone in his cell next to his toilet, in violation of his religious beliefs. *See, e.g.*, *Rush v. Malin*, No. 15 CV 3103 (VB), 2017 WL 2817080, at *3, 5 (S.D.N.Y. June 29, 2017) (finding that plaintiff's claim "that he was prevented from attending Jumu'ah services" for a period of time does plausibly state a Free Exercise claim and RLUIPA claim because "[d]enying an inmate congregate religious services over a prolonged period 'substantially burdens'" his religious exercise, and the defendants failed to assert a compelling reason for this burden); *Lloyd v. City of New York*, 43 F. Supp. 3d 254, 263 (S.D.N.Y. 2014) (refusing to dismiss Muslim inmates' Free Exercise Clause and RLUIPA claims and finding that plaintiffs have sufficiently

8

alleged that defendants placed a substantial burden on their ability to freely exercise their religion by failing to provide them with adequate and appropriate space for Muslim daily prayers, Jumu'ah, and other worship activities"); *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 344 (1987) ("There is no question that respondents' sincerely held religious beliefs compelled attendance at Jumu'ah"). Additionally, Mr. Emad is forced to do salah (his five daily prayers) in his cell next to his toilet, which also substantially burdens his ability to exercise his religion, as Islam requires that salah be conducted in a clean environment. *See, e.g.*, *Williams v. Sec'y Pa. Dep't of Corr.*, 450 Fed. App'x 191, 196 (3rd Cir. 2011) (where prisoner was prohibited from conducting salah on a clean surface in a quiet area, court found that his religious exercise was substantially burdened because he "was forced to choose between offering prayers in the manner consistent with his religious belief and being disciplined for being in an unauthorized area or for refusing to obey an order"); *Knott v. McLaughlin*, No. 5:17-CV-36 (MTTT), 2019 WL 1379943, at *4 (M.D. Ga. Mar. 27, 2019) (where Muslim inmate was forced to pray inside his cell, court denied summary judgement on his RLUIPA claim because there was "a genuine issue of material fact regarding whether congregational prayer is a central tenant of his religion and whether the Defendant's complete ban on congregational prayer substantially burdens his exercise of religion").

Further, there is no legitimate, let along compelling, government interest in prohibiting Mr. Emad from conducting Jumu'ah or praying in a clean space outside his cell, especially given that Christian detainees are allowed to use a room for bible study—which is the same room Mr. Emad is requesting to use for Jumu'ah—and Christian detainees are allowed to pray out in the common areas of the pod. Any "security concerns" that the Jail will likely assert as a justification for prohibiting inmate-led Jumu'ah and other daily prayers in common spaces will be pretextual,

as the Jail affords Christian detainees the opportunity to do individual and communal prayer outside their cells.  Further, a requirement that services be volunteer-led instead of inmate-led is not narrowly tailored to any supposed security concern, as correctional staff could supervise inmate-led services.  *See e.g.*, *West*, 607 Fed. App'x at 567 (allowing Muslim plaintiff's RLUIPA claim based on prison's refusal to allow inmate-led Islamic services including Jumu'ah to proceed, indicating that it appeared that defendants had not yet met their burden of establishing that banning inmate-led services was the least restrictive means of furthering their security interest); *Aiello v. West*, 207 F. Supp. 3d 886, 896-97 (W.D. Wis. 2016) (denying summary judgement on Jewish plaintiff's RLUIPA claim because plaintiff met his burden of proving that prison's ban on inmate-led Shabbat services seriously violates his religious beliefs and the defendants have not met their burden of establishing that the general ban on inmate-led groups is narrowly tailored to a compelling interest in maintaining security); *Smith v. Lind*, No. 14-cv-796-slc, 2016 WL 6210688, at *6, 9 (WD. Wis. Oct. 24, 2016) (refusing to dismiss plaintiff's RLUIPA and First Amendment claims based on defendants' repeated denial of religious services to Muslim inmates, including Jumu'ah, due to lack of volunteers, stating that the plaintiff's allegations "not only appear to challenge the volunteer policy generally, they also raise the question whether the defendants have improperly put more effort into securing volunteers for non-Muslim faiths and left the Muslims to languish"); *Henderson v. Muniz*, No. 14-cv-01857-JST, 2017 WL 6885394, at *10 (N.D. Cal. Nov. 28, 2017) (denying summary judgement on plaintiff's First Amendment claim regarding Jumu'ah prayers and five-time daily prayers because "there is a triable issue of fact as to whether the requirement that a chaplain, and not a prison guard supervise chapel use is reasonably related to prison security"); *Williams*, 450 Fed. App'x at 196 (where prisoner was prohibited from conducting salah on a clean surface in a quite area, the

10

court denied summary judgement as to his RLUIPA claim because there was a fact issue on whether a designated prayer room in prison kitchen was least restrict means of furthering compelling government interest of maintaining order and security). Therefore, the Jail's prohibition on allowing Muslims to do Jumu'ah or salah outside their cells undoubtedly cannot survive strict scrutiny review under RLUIPA and RFRA, nor even the more deferential review under the Free Exercise Clause. Accordingly, Mr. Emad will prevail on all of these claims.

### C. Mr. Emad will prevail on his claim that Defendants violated his due process rights under the stigma-plus doctrine.

Mr. Emad has a claim for deprivation of a protected liberty interest without adequate due process. *See Hannemann v. S. Door Cty. Sch. Dist.*, 673 F.3d 746, 753 (7th Cir. 2012) ("A plaintiff may prove a deprivation of a protected liberty interest by showing damage to his 'good name, reputation, honor, or integrity.'" (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)). This "stigmatic harm," however, must "extend beyond mere reputational interests," for procedural safeguards to come into play. *Id.* (quoting *Omosegbon v. Wells*, 335 F.3d 668, 675 (7th Cir. 2003)). Under what is commonly known as the "stigma-plus doctrine," procedural due process rights are implicated when (1) the government publically stigmatizes an individual, and (2) the individual suffers the loss of an additional liberty or property interest as a result. *See Paul v. Davis*, 424 U.S. 693, 707-712 (1976); *Miller v. California*, 355 F.3d 1172, 1178 (9th Cir. 2004). To constitute sufficient loss of liberty, the stigmatizing statement must "alter or eliminate 'a right or status previously recognized by state law.'" *Hannemann*, 673 F.3d at 753 (quoting *Paul*, 424 U.S. at 711); *see also Alston v. City of Madison*, 853 F.3d 901, 909 (7th Cir. 2017) ("the action must also alter a previously recognized legal status or right"). Mr. Emad will be able to prove both elements of the stigma-plus claim.

Mr. Emad easily meets the first prong of the stigma-plus analysis because Defendants gave him an erroneous stigmatic label, which they then publicized. Being labelled a terrorist and a danger to national security is undoubtedly stigmatizing because it implies criminal conduct. *See, e.g.*, *Alston*, 853 F.3d 901, 909 ("Without question, being classified as a 'repeat violent offender' harms one's reputation."); *Latif v. Holder*, 28 F. Supp. 3d. 1134, 1150 (D. Or. 2014) ("placement on the No-Fly List satisfies the 'stigma' prong because it carries with it the stigma of being a suspected terrorist"). Further, Defendants publicized Mr. Emad's stigmatizing label by sharing it with third parties—Defendant McPherson of the FBI shared it with Defendant D'Agostino of ICE, and Defendant D'Agostino and ICE shared it with the immigration court. *See, e.g.*, *Larry v. Lawler*, 605 F.2d 954, 958 (7th Cir. 1978) (holding that the Civil Service Commission's sharing of plaintiff's stigmatizing rejection with federal agencies on a "need to know basis" was sufficiently public); *Latif*, 28 F.Supp.3d at 1150 (finding that the plaintiffs' "No-Fly" status was made sufficiently public when it was only disclosed to airline employees and any travelers that may be in earshot of the ticket counter); *Castillo v. County of Los Angeles*, 959 F. Supp. 2d 1255, 1261-62 (C.D. Cal. 2013) (finding that plaintiff's inclusion in the Child Welfare Services Case Management System (CWS/CMS) database was made sufficiently public because even though information in the database "is not publicly available, . . . information included in CWS/CMS is available  . . . to numerous in-state and out-of state governmental entities and agencies").

Mr. Emad also meets the second prong of the stigma-plus doctrine. In considering the "plus" prong of the stigma-plus doctrine, courts have found deprivations of liberty interests in a wide range of contexts, including employment, licensure, education, and travel. *See, e.g.*, *Goss v. Lopez*, 419 U.S. 565, 574-76 (1975) (holding that students facing temporary suspension from

12

public school for up to ten days based on charges of misconduct were entitled to protection under the due process clause); *Dupuy v. Samuels*, 397 F.3d 493, 503 (7th Cir. 2005) (finding that where "child care workers effectively are barred from future employment in the child care field once an indicated finding of child abuse or neglect against them is disclosed to, and used by, licensing agencies and present or prospective employers . . . [s]uch circumstances squarely implicate a protected liberty interest"); *Larry*, 605 F.2d at 956 (finding a liberty interest in employment where plaintiff was barred from "obtaining employment in any capacity with the federal government for a period of up to three years"); *Latif*, 28 F. Supp. 3d at 1150 (finding that plaintiffs "satisfied the 'plus' prong because being on the No-Fly List means Plaintiffs are legally barred from traveling by air at least to and from the United States and over United States airspace, which they would be able to do but for their inclusion on the No-Fly List"); *Castillo*, 959 F. Supp. 2d at 1261-62 (holding that the "plus" prong was met where plaintiff's inclusion in the Child Welfare Services database had "serious implications" for his ability to adopt his half-brother, get licensures, and volunteer with children). Here, Mr. Emad was denied bond by the immigration court and forced to remain in custody. If not for the false terrorist label, Mr. Emad would have received bond and been able to live at home during the pendency of his immigration proceedings. Therefore the terrorist label altered or eliminated "a previously recognized legal status or right." *See Alston*, 853 F.3d 901, 909; *see also Hall v. Marshall*, 479 F. Supp. 2d 304, 314 (E.D.N.Y. 2007 (finding that plaintiff met requirements of stigma plus doctrine where he alleged that his pre-sentence report (PSR) "contained a description of his offense that was factually false and damaging to his reputation" and that "he was denied parole based on an inaccurate PSR"). Mr. Emad has therefore established a constitutionally-protected liberty interest in his reputation.

Given that Mr. Emad has a constitutionally-protected liberty interest in his reputation, Defendants had to provide basic procedural protections before sharing the false terrorist label with third parties. *See Wisconsin*, 400 U.S. 433 at 510 ("Where a person's good name, honor, and reputation are at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Mr. Emad was denied any due process protections before both the FBI and ICE labeled him a terrorist and shared that false label—neither the FBI nor ICE gave him notice or an opportunity to challenge the false terrorist label. Accordingly, Mr. Emad will prevail on his Due Process claim.

### D. Mr. Emad will prevail on his claim that the ICE Defendants violated his rights under the Equal Protection Clause.

To prevail on an equal protection claim, Mr. Emad must prove that: (1) the Defendants treated him differently from others who were similarly situated; (2) the Defendants intentionally treated him differently because of his membership in a definable class (i.e., his religion and national origin); and (3) the Defendants' discriminatory conduct was not rationally related to a legitimate state interest. *See Schroeder v. Hamilton School Dist.*, 282 F.3d 946, 950-51 (7th Cir. 2002); *Nabozny v. Podlesny*, 92 F.3d 446, 454-455 (7th Cir. 1996); *Sims v. Mulcahy*, 902 F.2d 524, 539 (7th Cir. 1990). Mr. Emad meets all of these criteria.

ICE is refusing to release Mr. Emad from detention despite the fact that he is unremovable and has been in custody for over 180 days since the date of his removal order. Ordinarily, ICE releases individuals who are unremovable and have been detained for over 180 days on an order of supervision rather than detain the individuals indefinitely. However, ICE is intentionally treating Mr. Emad differently from others similarly situated because of his religion (Islam) and

14

national origin (Palestinian). *See, e.g.*, *Mehta v. Village of Bolingbrook*, 196 F. Supp. 3d 855, 863-66 (N.D. Ill 2016) (denying summary judgment on family's equal protection claim because fact issue existed as to whether village police who stopped, searched, and harassed Hindu residents who were of Indian descent, did so for a discriminatory purpose); *Alsherbini v. Village of Worth*, No. 10 CV 6781, 2011 WL 1303427, at *4 (N.D. Ill. Mar. 31, 2011) (rejecting defendants' argument that plaintiff "cannot prove discriminatory intent because in his complaint he alleges a race-neutral reason for their conduct: that he committed municipal code violations" because he also alleged that the violations "were a sham to carry out [the defendant's] policy of ridding the village of Middle Eastern owned businesses); *Goodvine v. Swiekatowski*, No. 08-cv-702, 2010 WL 55848, at *3-4 (W.D. Wis. Jan. 5, 2010) (denying summary judgment with respect to federal prisoner's claim of religious discrimination because there is a genuine issue of material fact as to whether the defendant was intentionally discriminating against plaintiff on the basis of religion by refusing to provide him with a copy of the Qur'an while providing Bibles to Christian prisoners).

Further, ICE's discriminatory conduct toward Mr. Emad is not rationally related to a legitimate state interest. Rather, ICE is using the false terrorist label as a pretextual guise for this administration's discriminatory animus towards Muslims and Palestinians. *See, e.g.*, *Reed v. Faulkner*, 842 F.2d 960, 964 (7th Cir. 1988) (finding that where defendants admitted that they did not enforce a prison regulation on hair length against Native Americans but did so against Rastafarians, and where there did not appear to be any relevant differences between Rastafarians and Native Americans, defendants were deliberately treating the Rastafarians differently from Native Americans "for no reason at all," and if this was truly the case, "this is a denial of equal protection of the laws in an elementary sense"); *Henderson v. Jess*, 18-cv-680, 2018 WL

7460046, at *3 (W.D. Wis. Oct. 25, 2018) (allowing black Muslim prisoner to proceed on equal protection race and religious discrimination claims against defendants where he alleged that defendants denied him religious meals and property, even though white Wiccan inmates were allowed to have similar meals and items, and that defendants singled him out for unfair treatment for no rational reason); *Atkinson v. Mackinnon*, No.14-cv-736, 2015 WL 13650062, at *1-2 (W.D. Wis. Jan. 7, 2015) (holding that prisoner could proceed on a claim against defendants under the equal protection clause of the Fifth Amendment on a theory of religious discrimination where he alleged that defendants gave him harsh discipline and poor work performance evaluations because of his Muslim religious practices). Accordingly, Mr. Emad will prevail on his claim that the ICE Defendants discriminated against him on the basis of his religion and national origin in violation of his rights under the Equal Protection Clause.

## II. Mr. Emad will suffer irreparable harm in the absence of a preliminary injunction.

A preliminary injunction is necessary to avert three forms of irreparable harm to Mr. Emad: 1) the ongoing violation of his constitutional rights, which in itself constitutes irreparable harm; 2) the continued, serious threats to his mental health; and 3) the continued, serious threat of indefinite detention.

First, the Defendants' continual deprivation of Mr. Emad's First, Fifth, and Fourteenth Amendment rights, as previously described, is an irreparable harm sufficient to warrant a preliminary injunction. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *American Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (same); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) (holding that loss of First Amendment freedoms, including free exercise of religion, presumptively constitutes

16

irreparable injury); *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest.") (affirming grant of preliminary injunction in prison conditions case); *Warsoldier v. Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005) (holding that, for the purposes of a preliminary injunction within the context of a case challenging violation of rights under RLUIPA, *any* loss of First Amendment religious rights constitutes irreparable injury); *Planned Parenthood of Ind. and Ky., Inc. v. Commissioner*, 194 F. Supp. 3d. 818, 835 (S.D. Ind. 2016) (finding that the "presumption of irreparable harm also applies to equal protection violations").

Second, the pain Mr. Emad experiences because of the Defendants' lack of care for his mental illness and the risk to his future mental health indisputably constitute irreparable harm that warrants preliminary injunctive relief. *See Flynn v. Doyle*, 630 F. Supp. 2d 987, 993 (E.D. Wis. 2009) (granting a preliminary injunction in a prison medical care case where the irreparable harm constituted continued medication errors and delays, which will result in life-threatening risks, the exacerbation of chronic and acute serious medical conditions, and unnecessary pain and suffering).  In the detention context, where "[t]he plaintiff's evidence allows an inference that the defendants 'have, with deliberate indifference, exposed him to . . . an unreasonable risk of serious damage to his future health,'" courts will find that irreparable harm exists.  *Farnam v. Walker*, 593 F. Supp. 2d 1000, 1012-13 (C.D. Ill. 2009) (quoting Helling v. McKinney, 509 U.S. 25, 35 (1993).  Thus, in numerous cases, courts have granted preliminary injunctive relief to ensure that people living in jails and prisons receive adequate medical and mental health care.  *See, e.g.*, *Foster v. Ghosh*, 4 F. Supp. 3d 974, 977 (N.D. Ill. 2013) (granting plaintiff's preliminary injunction requesting that prison doctors grant him access to an ophthalmologist to evaluate his

17

cataracts and subsequently provide him with adequate treatment); *Hernandez v. Cty. of Monterey*, 110 F. Supp. 3d 929, 956 (N.D. Cal. 2015) (granting preliminary injunctive relief requiring jail to provide proper TB identification, isolation, diagnosis and treatment, to eliminate potential suicide hazards for unstable patients, to continue community medications, properly treat inmate's withdrawing from drugs and alcohol, and to rectify ADA violations for individuals who need sign language interpreters); *Flynn v. Doyle*, 630 F. Supp. 2d 987 (E.D. Wis. 2009) (granting preliminary injunction requiring all controlled medications at the prison be distributed by trained medical personnel with credentials equal to or greater than Licensed Practical Nurses); *Yarbaugh v. Roach*, 736 F. Supp. 318 (D.D.C. 1990) (granting preliminary injunction to have prison provide inmate with adequate medical treatment for his multiple sclerosis); *Duran v. Anaya*, 642 F. Supp. 510 (D.N.M. 1986) (inmates were entitled to a preliminary injunction prohibiting implementation of proposed staff reductions with respect to medical care, mental health care, and security).

Third, Mr. Emad faces the possibility of indefinite detention because ICE continues to use the FBI memo that falsely labels Mr. Emad a terrorist as a pretextual justification to keep Mr. Emad detained passed the 180-day deadline. The risk of indefinite detention based on a false terrorist label certainly constitutes irreparable harm.

### III. Mr. Emad lacks an adequate remedy at law for ongoing violations of constitutional rights and risks to safety.

Money will not make Mr. Emad whole, treat his medical and spiritual needs, or clear his name of the false terrorist label. Only an order from this Court will accomplish this. *See Christian Legal Soc'y*, 453 F.3d at 859 ("[t]he loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate"); *Flower Cab Co. v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982) (stating that in prison conditions cases, "the quantification of injury is difficult and damages are therefore not an adequate remedy"); *Foster v.*

*Ghosh*, 4 F. Supp. 3d 974, 983 (N.D. Ill. 2013) (granting preliminary injunction to prisoner requiring medical attention; no adequate remedy at law exists because "the consequence of inaction at this stage would be further deteriorated vision in both eyes").

IV. **Mr. Emad will suffer greater harm if a preliminary injunction is denied than Defendants will suffer if the preliminary injunction is granted and an injunction is in the public interest.**

The balance of harms tips decidedly in Mr. Emad's favor. The injunction sought here merely requires that the Defendants adhere to their constitutional and statutory obligations. Such an injunction will ensure Mr. Emad's health and end his mental, spiritual, and emotional suffering caused by the Defendants. On the other hand, adhering to this injunction would cause the Defendants minimal if any harm. Administrative costs associated with the implementation of a preliminary injunction are not the sort of harm to Defendants that can justify the ongoing violation of a constitutional right. *See Mitchell v. Cuomo*, 748 F.2d 804, 806, 808 (2d Cir. 1984) ("Faced with such a conflict between the state's financial and administrative concerns on the one hand, and the risk of substantial constitutional harm to plaintiffs on the other, we have little difficulty concluding that the district judge did not err in finding that the balance of hardships tips decidedly in plaintiffs' favor."); *Moore v. Morgan*, 922 F.2d 1553, 1557 n.4 (11th Cir.1991).

Moreover, it is in the public interest to ensure that Mr. Emad's constitutional rights are not violated by state and federal officers. *See Hoskins v. Dilday*, No. 16-CR-334-MJR-SCW, 2017 WL 951410, at *7 (S.D. Ill. Mar. 10, 2017) ("In this case the public interest is best served by ensuring that corrections officers obey the law."); *Jones 'EL v. Berge*, 164 F. Supp. 2d 1096, 1125 (W.D. Wis. 2001) ("Respect for law, particularly by officials responsible for the administration of the State's correctional system, is in itself a matter of the highest public interest."); *Laube v. Haley*, 234 F.Supp.2d 1227, 1252 (M.D. Ala. 2002) ("[T]here is a strong public interest in

19

requiring that the plaintiffs' constitutional rights no longer be violated"); *Vazquez v. Carver*, 729 F. Supp. 1063, 1070 (E.D. Pa. 1989) ("the public has an interest in protecting the civil rights of all persons as guaranteed under the United States Constitution").

## V. The Court should waive bond.

Under Federal Rule of Civil Procedure 65(c), district courts have discretion to determine the amount of the bond accompanying a preliminary injunction, and this includes the authority to set a nominal bond. In this case, the Court should waive bond because Mr. Emad is indigent, the requested preliminary injunction is in the public interest, and the injunction is necessary to vindicate constitutional rights. *See Pocklington v. O'Leary*, No. 86 C 2676, 1986 WL 5748, at *2 (N.D. Ill. May 6, 1986) ("[B]ecause of [a prisoner's] indigent status, no bond under Rule 65(c) is required."); *Davis v. Mineta*, 302 F.3d 1104, 1126 (10th Cir. 2002) ("minimal bond amount should be considered" in public interest case); *Complete Angler, L.L.C. v. City of Clearwater*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009) ("Waiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right.").

## CONCLUSION

For the foregoing reasons, the Court should order an evidentiary hearing on the motion for a preliminary injunction at the earliest possible date and/or enter the proposed order and ensure that Mr. Emad receives adequate mental health services and religious accommodations, and that the false terrorist label is removed.

Respectfully submitted,

**MOHAMED SALAH MOHAMED AHMED EMAD**

By: /s/ Vanessa del Valle
One of his attorneys

20

Sheila A. Bedi
Vanessa del Valle
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-1271
sheila.bedi@law.northwestern.edu
vanessa.delvalle@law.northwestern.edu


Marc E. Christopher
Christopher and De Leon Law Office
PO Box 370452
Milwaukee, WI 53237
(414) 751-0051
marc@christopher-law.com


## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that she served the foregoing document upon all persons who have filed appearances in this case via the Court's CM/ECF system on April 25, 2019.


/s/ Vanessa del Valle