UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MOHAMED SALAH MOHAMED A EMAD,
      Plaintiff,

v.                                                      Case No. 19-cv-0598

DODGE COUNTY, et al.,
      Defendant.

## DECISION AND ORDER

Plaintiff Mohamed Salah Mohamed A Emad brings this action under § 1983 alleging that defendants violated his constitutional rights while he was a detainee at Dodge County Detention Facility (the "Jail"). Specifically, plaintiff argues that defendants Sheriff Dale Schmidt, Jail Administrator Brugger, and Officers Jerry Schlegel, Chris Myers, Matthew Marvin, and Scott Buckner violated his rights by preventing him from attending Islamic religious services and prohibiting him from praying outside of his cell which he considered unclean because it contained a toilet. Plaintiff also names Dodge County as a defendant for indemnity purposes. Before me is defendants' motion for summary judgment which I will grant for the reasons explained below.

### I.    Background

#### A. Defendants' Roles

Schmidt was the Sheriff of Dodge County. He was responsible for Jail operations but was not involved on a day-to-day basis. He had no personal contact with plaintiff. He had final policy making authority at the Jail. Brugger was the Jail Administrator. He regularly reviewed and updated the Jail's Religious Service Policy. He too had no personal contact with plaintiff. Marvin was either a Programs Specialist or the corporal in

charge of the Programs Department. Schlegel, Myers, and Buckner were Programs Specialists. The Programs Department set the Jail's religious programming schedule and found volunteers to lead religious services.

### B. Jail Policies

Two Jail policies are at issue. The first prohibits "Group activities led by inmates." ECF no. 86-13 p. 29. The second provides "Personal worship may be done in your cell or beside your bunk. It is not permitted in the dayroom areas." *Id.* at p. 30. "Personal worship" is not defined, but Schmidt understood the policy to allow personal verbal prayers or bowing one's head to say grace but to prohibit "more involved" worship including ceremony, rituals, special clothing, mats, or other outside items. ECF no. 86-2 pp. 45-48. Schmidt further stated that this "more involved" worship was banned because it was likely to disturb others in the area and create security concerns. *Id.* at 47.

### C. Plaintiff's Allegations

Plaintiff is a Muslim who was detained for fourteen months at the Jail from March 12, 2018, to May 13, 2019. As part of his religious practice, plaintiff engages in daily prayer five times a day at prescribed times, a practice known as salah. Plaintiff believes that Islam requires Muslims, when they are physically able, to prostrate when praying, touching all of their limbs and forehead to the ground, in order to show humility to God. Plaintiff believes that salah must be conducted in a clean and pure environment and that prayer in any room with a toilet is prohibited because toilets are unclean spaces. Plaintiff also believes that Islam compels attendance at weekly Jumu'ah, or congregational prayer, each Friday just after noon. Plaintiff believes that Jumu'ah must be conducted with two or more people in a clean space. Jumu'ah is typically led by an imam at a

2

mosque, but plaintiff believes it is acceptable to conduct Jumu'ah without an imam and in a location other than a mosque as long as one prays in a group of two or more. Jumu'ah is composed of a short sermon, called a khutbah, followed by prayer.

While plaintiff was detained at the Jail, he was housed in a small cell with a bed, bookshelf, toilet, and sink. As a result of the Jail's policy requiring personal worship to take place in a detainee's cell, plaintiff prayed five times a day in his cell next to a toilet. Plaintiff asked several officers, whom he does not identify, if he could pray outside of his cell in an area without a toilet but his requests were denied. The Jail did not offer Jumu'ah services or other religious programming aimed at Muslims. Outside volunteers led all religious programming, and most of it was Christian in nature. Prior to plaintiff's detention, the Programs Department attempted to find an imam to provide Islamic services at the Jail, but the imams asked to be paid, and the Programs Department opted not to hire one. On March 28, 2017, plaintiff filed an inmate request slip asking that the Jail allocate a room for him to conduct Jumu'ah with other Muslim detainees. Defendant Buckner denied the request, stating the Jail does not allow detainee-led activities. Plaintiff later filed a written grievance requesting space to conduct Jumu'ah and pointing out that Christian detainees and inmates were given space to conduct Bible studies and seminars.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I view the evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

## III. ANALYSIS

### A. Personal Involvement

Section 1983 creates a cause of action based upon personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation. *McBride v. Soos*, 679 F.2d 1223, 1227 (7th Cir. 1982); *Adams v. Pate*, 445 F.2nd 105, 107 (7th Cir. 1971). A showing of personal involvement requires "a causal connection between (1) the sued officials and (2) the alleged misconduct." *Colbert v. City of Chi.*, 851 F.3d 649, 657 (7th Cir. 2017). "[D]irect participation" is not necessary; rather, it is enough that the official "acquiesced in some demonstrable way in the alleged constitutional violation." *Palmer v. Marion Cty.*, 327 F.3d 588, 594 (7th Cir. 2003); *see also Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009) ("To be personally responsible, an official must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." (edited for clarity)). Defendants argue that defendants Schmidt, Brugger, and Schlegel cannot be held liable under § 1983 because they had no personal contact with the plaintiff. Plaintiff counters that Schmidt and Brugger, as the Sheriff and Jail Administrator, were the chief policy makers for the jail and therefore may be liable to the extent jail policies violated plaintiff's constitutional rights. Plaintiff also argues that Schlegel, as a program specialist, was responsible for setting religious programming at the Jail and may be liable to the extent that the religious programming was constitutionally deficient. Plaintiff is correct. If a supervisor designed or is aware of an institution's policy that caused a constitutional injury, he may be individually liable for that injury. *Daniel v. Cook County*, 833 F.3d 728, 737 (7th Cir. 2016). Defendants do not dispute that Schmidt and Brugger had the authority to change policies or that both

4

were aware of the relevant policies. If plaintiff can show that one of these policies caused a constitutional injury, Schmidt and Brugger may be held personally liable. Similarly, if plaintiff can show that Schlegel's religious programming was constitutionally deficient and caused an injury, he may be held personally liable for that injury.

## B. Free Exercise Claims

To survive a motion for summary judgment on his free exercise claims, plaintiff must "submit evidence from which a jury could reasonably find that the defendants personally and unjustifiably placed a substantial burden on his religious practices." *Neely-Bey Tarik-El v. Conley*, 912 F.3d 989, 1003 (7th Cir. 2019) (citations omitted). A substantial burden is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981). Even if a "regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *O'Lone v. Shabazz*, 482 U.S. 342, 349 (1987) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). [1] This "reasonableness test" is "less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights," in recognition that "limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives." *Id.* at 349-350 (citations omitted).

---

[1] *O'Lone* and *Turner* addressed whether the policies of a prison, rather than a jail, were reasonably related to legitimate penological interests but the same standards apply to jail polices. *See Miller v. Downey*, 915 F.3d 460, 464 (7th Cir. 2019).

5

The Supreme Court has set forth a four-factor test, known as the *Turner* test, to determine whether a regulation is unreasonable.[2] *Turner*, 482 U.S. at 84-91. First, there must be a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* at 89. Second, I must consider whether there are "alternative means of exercising the right that remain open" to the plaintiff. *Id.* at 90. Third, I must consider whether accommodation of the right will have a "ripple effect" on fellow inmates, staff, or institutional resources generally. *Id.* And, fourth, I must consider whether there are obvious, easy alternatives to accommodate the plaintiff's rights. *Id.* In evaluating whether there is a valid, rational connection between a restriction and the government's legitimate penological interests, the initial burden of proof rests on the defendant government officials. *Singer v. Raemisch*, 590 F.3d 529, 536-37 (7th Cir. 2010). Once the defendants offer a "plausible explanation" for the restriction, the burden shifts to the plaintiff to present evidence undermining the officials' explanation. *Id.* Plaintiff argues that defendants violated his constitutional right to free exercise in three ways: (1) by prohibiting inmates or detainees from leading Jumu'ah; (2) by prohibiting prayer in the day room areas, leaving him no option but to pray in his cell with a toilet; and (3) by failing to recruit Islamic religious leaders to lead Jumu'ah.

1. **Prohibition of Inmate-Led Group Activities**

Plaintiff asserts that the policy prohibiting inmate-led group activities violated his rights because it prevented him from participating in Jumu'ah. Although plaintiff does not

---

[2] Plaintiff was a civil detainee rather than a prisoner, but the parties agree that the *Turner* test applies. The Seventh Circuit has applied the *Turner* test to civil detainees. *Brown v. Phillips*, 801 F.3d 849, 852 (7th Cir. 2015).

specify which defendants he brings this claim against, Schmidt and Brugger are the only defendants who conceiveably could be found liable for a violation caused by the policy. Buckner denied plaintiff permission to conduct Jumu'ah without an outside leader, but plaintiff does not allege that Buckner had authority to grant the request or to change the policy. Without such authority, Buckner had no option but to deny the request. Thus, plaintiff cannot show that Buckner intentionally caused any resulting violation.

Even assuming that the policy placed a substantial burden on plaintiff's religious practices, plaintiff does not show that it was not reasonably related to a legitimate penological interest. Defendants argue that the prohibition on inmate-led activities serves the interests of security, institutional order, and staff safety. Specifically, defendants argue that without an outside religious leader, any individual could falsely claim that he was leading a religious group in order to hide his efforts to organize criminal or gang related activity. Defendants also point to the opinion of their expert witness, Jeff Carter, a former National Jail Consultant, who agrees that having an outside religious leader serves the interests of safety and security. Preventing gang and other organized criminal activity is a valid penological interest. *Singer v. Raemisch*, 593 F.3d 529, 535 (7th Cir. 2010). And the Seventh Circuit has repeatedly held that prohibiting inmate-led religious services is a valid and rational way to prevent such activity. *See, e.g., Johnson-Bey v. Lane*, 863 F.2d 1308, 1310-11 (7th Cir. 1998); *Hadi v. Horn*, 830 F.3d 779, 784-85 (7th Cir. 1987).

Plaintiff argues that the policy is nonetheless not rationally connected to a legitimate security concern because it is not consistently applied. Specifically, plaintiff argues that defendants permitted Christian detainees to participate in communal prayer and Bible study in the dayroom. Multiple detainees stated that they observed groups of

7

Christian detainees or inmates praying together or reading the bible in the dayroom or library and that jail officers did not interfere. Several jail officers also stated that they allowed Christian inmates to pray together at a table, read the Bible out loud together, and say grace together before a meal.

If a policy is enforced in a discriminatory manner, it may call into question the proposed security rationale behind the policy. *See Grayson v. Schuler*, 666 F.3d 450, 453 (7th Cir. 2012). But plaintiff does not allege that Schmidt or Brugger were aware of the discriminatory enforcement. None of the jail officers who stated they allowed group prayer in the dayroom are named defendants, and none stated that they reported the incidents to Schmidt or Brugger. The detainee witnesses do not even name the jail officers they believe allowed the group prayer. Section 1983 does not permit *respondeat superior* liability so Schmidt and Brugger cannot be held liable for discriminatory enforcement in which they did not participate and/or of which they were unaware.

Next plaintiff argues that defendants cannot show that allowing Jumu'ah presents a real security threat, especially for "low risk" civil detainees such as himself. Plaintiff points to the testimony of his own expert, Phil Stanley, a former prison warden, who opines that Jumu'ah is not related to gang activity. But defendants are not arguing that Jumu'ah is inherently a gang-related activity; their stated security concern is that an inmate or detainee could lie about his intentions to conduct a religious service and use the service as cover for prohibited activities. Plaintiff's evidence does not undermine defendants' assertion. Nor were defendants required to make an exception to the general policy prohibiting inmate-led activities to allow "lower risk" groups to conduct inmate-led services. *Turner* does not require institutions to address valid concerns with the least

8

restrictive alternative. 482 U.S. at 90-91. Defendants have shown that the prohibition on inmate-led activities is rationally related to a legitimate interest, and plaintiffs' evidence does not undermine their showing. Accordingly, the first *Turner* factor weighs in favor of defendants.

The second *Turner* factor, whether plaintiff had an alternative means of exercising his right, weighs in favor of plaintiff. Because the Jail offered no Islamic religious programming, plaintiff did not have any other opportunities to participate in congregational prayer or group worship. The third factor, whether accommodating the request is likely to have a ripple effect on guards or resources, weighs in favor of the defendants. Defendants argue that allowing Muslim detainees to conduct Jumu'ah services without an outside leader would lead to requests from other groups to conduct their own group activities without an outside leader, putting a strain on guards and jail resources. Plaintiffs do not dispute this argument. The fourth factor, whether there are obvious easy alternatives to accommodating the plaintiff, also weighs in favor of defendants. Plaintiffs suggest that defendants could have hired an imam or assigned a guard to supervise services. Defendants counter that hiring an imam would be expensive and that they do not have sufficient staff to supervise Jumu'ah. Neither appears the be the "easy or obvious" solution contemplated by *Turner*. Considering these factors together, I find that a reasonable jury could not conclude that the policy was not reasonably related to a valid penological interest.

Finally, even if plaintiff were able to show defendants violated his rights by banning inmate-led group activities, his claim would fail because defendants are entitled to qualified immunity. Qualified immunity shields defendants from liability for monetary

9

damages if "their actions do not violate clearly established constitutional or statutory rights." *Harlow v. Fitzgerald*, 547 U.S. 800, 818 (1982). To demonstrate a right is clearly established, plaintiff must point to a Supreme Court case, a case from the Seventh Circuit, or "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999). Courts are required to define the clearly established right at issue on the basis of the specific context of the case. *Tolan v. Cotton,* 134 S. Ct. 1861, 1866 (2014). Existing precedent must have placed the question "beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Plaintiff has not identified a Seventh Circuit or Supreme Court case establishing an inmate's right to congregational services or inmate-led services. Indeed, Seventh Circuit precedent would suggest to a reasonable officer that no such right exists. The Seventh Circuit has previously held that prisons "need not … allow inmates to conduct their own religious services, a practice that might not only foment conspiracies but also create (though more likely merely recognize) a leadership hierarchy among the prisoners" *Johnson-Bey*, 863 F.2d 1308, 1310 (7th Cir. 1988). The Seventh Circuit also affirmed the finding of qualified immunity in a case similar to this one, reasoning that even presuming that weekly Jumu'ah attendance was a fundamental tenet of Islam, such cases as *Johnson-Bey* and *Hadi* confirmed that prisons can constitutionally preclude inmates from leading services for security reasons. *Turner v. Hamblin*, 590 Fed. App'x 616, 620 (7th Cir. 2014). In light of these cases, I cannot say that reasonable officials would have understood that banning detainee-led services violated a constitutional right and defendants are therefore entitled to qualified immunity on this issue.

10

The cases cited by plaintiff do not alter this conclusion. Rather, they establish, at a general level, that jail officials may not prevent religious practice without a valid penological interest.[3] They do not address the issue of whether a ban on detainee-led services can constitute a violation of plaintiff's constitutional rights. Accordingly, I will grant defendants' motion for summary judgment as regards the prohibition on inmate-led group activities.

### 2. Prohibition of Personal Worship in the Day Room

Plaintiff next argues that the policy prohibiting personal worship in the dayroom violated his rights because it forced him to conduct salah in his cell next to a toilet. Again, only Schmidt or Brugger could be liable for violations caused by this policy; plaintiff does not allege other defendants enforced the policy or had the authority to change it. Defendants first argue that plaintiff cannot show that having to pray in a room with a toilet was a substantial burden on his religious practice. I disagree. Plaintiff discussed at length during his deposition why he believed that prayer next to a toilet was prohibited by his Islamic faith. Plaintiff also points to the expert opinion of Professor Brandon Ingram, a specialist in the study of Islam, who stated it is a "foregone conclusion" that prayer next to a toilet is not permissible. This is sufficient evidence for a jury to find his free exercise was substantially burdened.

Defendants argue that plaintiff does not cite any "admissible, authenticated Islamic law" that suggests he is prohibited from praying in room with a toilet. But plaintiff is not

---

[3] Plaintiff also cites to cases establishing that otherwise reasonable policies may not be enforced in a discriminatory manner. However, plaintiff offers no evidence that defendants enforced the policy in a discriminatory manner.

11

required to present such evidence; the test is not whether a restriction violates an official tenet of a sect, but whether the *plaintiff* is substantially burdened in practicing his sincerely held beliefs. *Ortiz v. Downey*, 561 F.3d 664, 669 (7th Cir. 2009) ("A person's religious beliefs are personal to that individual; they are not subject to restriction by the personal theological views of another.")

The next question is whether the policy is reasonably related to a legitimate penological interest, which requires a consideration of the *Turner* factors. Regarding the first factor, defendants argue that the prohibition serves, "various legitimate penological interests, including maintenance or security, institutional order, and staff safety." ECF no. 76 p. 11 (internal citations omitted). But defendants do not otherwise explain how a prohibition on personal worship in the dayroom serves those interests. Their arguments address only the security concerns related to group worship, not to individual worship. Defendant Schmidt stated that personal worship in the dayroom could cause disturbances or pose security risks, but similarly did not elaborate on what those security risks might be. Defendants cannot "avoid court scrutiny by reflexive, rote assertions." *Nigl v. Litscher*, 940 F.3d 329, 334 (7th Cir. 2019) (quoting *Riker v. Lemmon*, 798 F. 3d 546, 553 (7th Cir. 2015). Rather, they must "articulate their legitimate governmental interest in the regulation and provide some evidence supporting their concern." *Id.* Defendants have not done so here, and the first factor of the *Turner* test therefore weighs in favor of the plaintiff.

The remaining *Turner* factors also weigh in favor of plaintiff. Regarding the second factor, plaintiff did not have other opportunities to practice his religion as there were no Muslim religious services offered and personal worship was allowed only in an area he considered unsuitable. Regarding the third factor, plaintiff argues that individual prayer in

12

the dayroom would not create a "ripple effect" disturbing guards or affecting prison resources because guards are already present in the dayroom and would be able to easily supervise personal prayer. Defendants do dispute this argument. Finally, plaintiff identifies obvious, easy alternatives to the policy, such as allowing him to pray elsewhere in his cell pod in rooms without a toilet, all of which were already supervised by officers. Again, defendants do not dispute this argument. Because all four *Turner* factors weigh in favor of plaintiff, I find a reasonable jury could conclude that the policy was not reasonably related to a valid penological interest.

That is not the end of the matter, however. Because defendants have raised a qualified immunity defense, plaintiff must show that it was clearly established that prohibiting him from praying in certain areas or limiting personal worship to a room with a toilet violated the Free Exercise Clause. *See Mannoia v. Farrow*, 476 F.3d 453, 457 (7th Cir. 2007)). To do so, plaintiff must point to a Supreme Court case, a case from the Seventh Circuit, or "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson*, 526 U.S. at 617. The case law must have put the question beyond debate. *Ashcroft*, 563 U.S. at 741.

Plaintiff fails to meet this burden. Plaintiff does not identify any case which addresses whether an institution may limit worship to certain areas, nor have I been able to find any such cases. Without such a case, I cannot conclude that a reasonable official would have been on notice that he was violating plaintiff's rights by prohibiting worship in the dayroom or limiting personal worship to a room with a toilet. I will note that a recent case in this district with nearly identical facts reached the same conclusion. In *Gill v. Michel*, the court found a genuine dispute of fact as to whether plaintiff's rights were

13

violated when he was required to conduct salah in a room with a toilet, but nonetheless found that defendants were protected by qualified immunity because, under existing case law, a reasonable official would not have known he was acting unlawfully by prohibiting prayer in the dayroom. No. 17-CV-873-PP, 2019 WL 4415638 at *9 (E.D. Wis. Sept. 16, 2019). Accordingly, I will grant defendant's motion for summary judgment as regards this claim

### 3. Failure to Recruit an Imam

Plaintiff also suggests that defendants violated his rights by failing to recruit Islamic religious leaders to lead Jumu'ah at the Jail. It is not clear from plaintiff's brief whether he means to bring this issue as a separate free exercise claim and because his argument is undeveloped, I will not address the issue at length. It is sufficient to say that the claim is barred by qualified immunity. The Free Exercise Clause does not require a jail to provide a "chaplain, priest, or minister" for each sect without regard to the extent of the demand. *Cruz v. Beto*, 405 U.S. 319, 322 n. 2 (1972). A recent unpublished Seventh Circuit decision explained that prisons and jails "are not required to arrange for religious leaders to perform communal religious services, so [the district court] properly concluded that the absence of an imam at the jail, despite the efforts to recruit one, does not violate the Free Exercise Clause." *Thompson v. Bukowski*, 812 Fed. App'x. 360, 364 (7th Cir. 2020). Here, it is undisputed that defendants made some efforts, however minimal, to locate volunteer imams. Plaintiff has not identified a case holding that the Constitution imposes *any* burden on officials to locate volunteers or pay for religious leaders, let alone a case that would have put defendants on notice that their efforts were constitutionally deficient. Because defendants could not have known from

14

existing precedent that their efforts violated the law, they are entitled to qualified immunity and I will grant defendants' motion for summary judgment as regards this issue.

### C. Equal Protection Claims

Plaintiff also argues that the defendants violated his rights under the Equal Protection Clause. The Equal Protection Clause prohibits state actors from purposefully treating an individual differently because of his membership in a particular class. *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000). A legitimate secular reason for any difference in treatment is fatal to the plaintiff's claim. *Kaufman v. McCaughtry*, 419 F.3d 678, 683 (7th Cir. 2005); *Reed v. Faulkner*, 842 F.2d 960, 962 (7th Cir. 1988) (difference in treatment must only be non-arbitrary). The plaintiff must also show that defendants acted, or failed to act, because the plaintiff is a Muslim. *Jackson*, 726 F.Supp. 2d at 1005 (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ("Where the claim is invidious discrimination … our decisions make clear that the plaintiff must plead and prove that the defendant acted with discriminatory purpose" and that defendant "undert[ook] a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group.")); *see also West v. Kingsland*, 679 F. App'x 482, 485 (7th Cir. 2017) (to avoid summary judgment, plaintiff needs evidence that the defendants acted with discriminatory purpose, meaning that their actions were motivated at least partly by a desire to adversely affect Muslims).

Plaintiff argues that the defendants violated his equal protection rights in three ways: (1) the religious programming offered at the Jail was primarily Christian and the Jail did not provide any Islamic religious programming; (2) The Jail's policy prohibiting

15

detainee-led group activities was not neutrally enforced; and (3) the Jail's policy prohibiting personal worship in the dayroom was not neutrally enforced.

Defendants do not dispute that the Jail offered no Islamic religious programming. But they argue this was due to a secular reason: they were unable to locate any Muslim religious leaders who were willing to provide Islamic religious services on a volunteer basis. Plaintiff argues that defendants should have made additional efforts to find a volunteer, but he points to no evidence that the efforts made to find a Muslim volunteer were any different than the efforts made to find volunteers for other religions. Nor does he point to any evidence from which a jury could infer that the failure to find a volunteer imam was motivated by a desire to adversely affect Muslims. Without such evidence, plaintiff cannot show that defendants violated his equal protection rights, and I will grant defendants' motion for summary judgment as regards this issue.

Plaintiff next argues that the policies banning inmate-led group activities and personal worship in the dayroom were not neutrally enforced in violation of the Equal Protection Clause. But plaintiff does not allege that any defendants were involved in or aware of any discriminatory enforcement. Again, Schmidt and Brugger can be liable only to the extent the policies themselves caused a constitutional violation, and plaintiff himself acknowledges the policies were facially neutral. ECF no. 85 p. 23 ("while the Jail maintained facially neutral policies prohibiting detainee-led group activities and personal worship in the common areas, these policies were solely deployed against Muslim detainees.") Bruckner denied a request to allow detainee led Jumu'ah, but plaintiff does not allege that Bruckner allowed Christians to conduct group prayer or was aware of any discriminatory enforcement. Plaintiff does not allege the remaining defendants had

16

Case 2:19-cv-00598-LA    Filed 05/03/22    Page 16 of 18    Document 92

any role in the enforcement of the policies. In other words, plaintiff has not offered any evidence that any defendant participated in discriminatory enforcement of the policies.

Plaintiff next argues that defendant Schmidt believed the policy banning personal worship in the dayroom did not prohibit verbal prayers but did prohibit "more involved" worship that involved special clothing, outside items, or mats. Plaintiff argues this definition of "personal worship" would prohibit Muslim inmates from practicing salah but would not prohibit most Christian prayers. But even if Schmidt knew the policy had a greater impact on Muslims than Christians, that alone is not sufficient evidence for a jury to infer that Schmidt *intended* the policy to single out Muslims. Indeed, the only other evidence regarding of Schmidt's intent in approving the policy indicates he believed "more involved" worship was more likely to disturb other inmates or pose a greater security risk. A reasonable jury could not infer from this evidence that Schmidt approved of the policy with the intent to adversely impact Muslims. Accordingly, I will grant defendants' motion for summary judgment as regards these claims.

### D. Dodge County

Plaintiff has named Dodge County as a defendant in this action, solely for indemnification purposes. Defendants argue that Dodge County is not a proper defendant. Because I have granted defendants' motion for summary judgment as regards all of plaintiff's other claims, Dodge County cannot be required to indemnify the other defendants and this issue is moot.

## IV. CONCLUSION

For the reasons stated, **IT IS ORDERED** that defendants' motion for summary judgment at ECF no. 75 is **GRANTED**. The Clerk of Court is directed to enter judgment in favor of the defendants in this case.

Dated at Milwaukee, Wisconsin, this 3rd day of May, 2022.

/s/Lynn Adelman_____
LYNN ADELMAN
United States District Judge